

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Colleen E. McGuinn*<br>*Assistant United States Attorney*<br>*Colleen.McGuinn@usdoj.gov* | *Suite 400*<br>*36 S. Charles Street*<br>*Baltimore, MD 21201-3119* | *DIRECT: 410-209-4803*<br>*MAIN: 410-209-4823*<br>*FAX: 410-962-3091* |

March 28, 2024

**<u>VIA ECF</u>**

Honorable Brendan A. Hurson
United States District Judge
District of Maryland
101 W. Lombard St.
Baltimore, MD 21201


   Re: *United States v. Christopher Thomas Yancy*
      Criminal No.  BAH-22-087 and 22-219

Dear Judge Hurson:

   On March 17, 2022, the Defendant was indicted in the United States District Court for the District of Maryland and charged with Count 1 (Illegal Possession of Machine Guns, in violation of 18 U.S.C. § 922(o)); Count 2 (Possession of Firearms by a Prohibited Person in violation of 18 U.S.C. § 922(g)): Count 3 (Possession of Unregistered Firearms, in violations of 18 U.S.C. §§5841, 5861 and 5871) and Count 4 (Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(D).  On January 4, 2024, the Defendant entered a plea of guilty to Count 1.

   On June 21, 2022, the Defendant was indicted in the United States District Court for the District of Maryland and charged with Count 1 (Wire Fraud Conspiracy, in violation of 18 U.S.C. § 1349); Counts 2-14 (Wire Fraud, in violation of 18 U.S.C. § 1343); and Count 35 (Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A). On November 30, 2022, a Superseding Indictment was returned with the same charges.  On January 4, 2024, the Defendant entered a plea of Guilty to Counts 1, 21 and 39, Conspiracy to Commit Wire Fraud, Wire Fraud and Aggravated Identity Theft, respectively.

   The sentencing hearing in the above-captioned matters is currently scheduled for April 11, 2024, at 10:00 a.m.  As calculated in the Presentence Investigation Report ("PSR") (ECF 229), the Defendant's offense level is 24 and his criminal history category is II, resulting in an advisory USSG sentencing range of 57 - 71 months of incarceration, followed by the 2-year mandatory minimum consecutive period of incarceration for Count 36.  ¶ 96, PSR.  The overall sentencing guidelines are therefore 81 - 95 months of incarceration.

The Government requests a sentence of 75 months of incarceration. In addition to a period of incarceration, the Government requests a period of three (3) years of supervised release, restitution in the amount of $2,094,319.00 and a special assessment of $100 for each count.

The Government submits that its requested sentence is sufficient, but no greater than necessary, to satisfy the purposes set forth in 18 U.S.C. 3553(a).

## I.       18 U.S.C. § 3553(a) Sentencing Factors

The Government's requested sentence of 75 months of incarceration is supported by the factors outlined in 18 U.S.C. § 3553(a).

### (1)       Nature and Circumstances of the Offense

First, as to "the nature and circumstances of the offense," under 18 U.S.C. § 3553(a)(1), the Government submits that the offense conduct was serious and victimized several individuals and entities. His blatant fraud during an international health crisis while also possessing machine guns, ghost guns, and other firearms is deserving of a harsh sentence.

BAH-22-219:

In the spring of 2020, Congress passed the Coronavirus Aid, Relief and Economic Security (CARES) Act, which provided for a variety of economic benefits to struggling Americans during a time of severe negative economic impact as a result of the COVID-19 pandemic. While most individuals were sheltering in place, taking care of loved ones, and often making tough financial sacrifices, the Defendant Christopher Yancy collaborated with others to fraudulently obtain and use COVID-19 benefit money, specifically unemployment insurance (UI) benefits. The Defendant repeatedly took advantage of programs meant to help those in need; he did so for his own selfish purposes. The personal identifying information (PII) of real people were used and compromised during this scheme. These victims cannot fully know today the long term affects this breach will have on them and their financial security.

As detailed in his plea agreement, the Defendant applied for and received UI benefits in the name of K.P. The Defendant detailed in the claim that K.P. was a carpenter who worked for a company and lived in Laurel, Maryland. Using his email address and while in his parents' home, the Defendant's filed claim yielded a payout of $12,092. A benefits card in K.P.'s name was found in the Defendant's residence during a search warrant on October 5, 2021:



In addition to K.P., the Defendant possessed benefits cards in the names of A.G., A.Z., A.T., R.E., M.A., J.L., and K.Y.  The resulting UI profiles at Bank of America for these 8 victims alone, including K.P. mentioned above, lead to a total loss of $271,336.00  The Defendant also maintained about 24 additional UI profiles through DOL and Bank of America, totaling over $180,000 in losses.


Multiple UI cards and credit cards from the search warrant

In the notes section of his phone, the Defendant had the PII of victim M.Q.  The Defendant sent that specific information to co-defendant Michael Makoge,  Makoge then filed a claim in M.Q.'s name and, in turn, withdrew over $10,000 across 23 ATM transactions.  Other PII that the Defendant willingly traded with his co-conspirators included victims Y.Z. and C.T. resulting in another $50,000 in losses.

The Defendant was also in possession of an arrow key, which is a specific key used by the United States Postal Service to open the blue mailboxes and retrieve the mail of citizens for delivery.  The key that was found was linked to the arrow keys used in Clinton, Maryland.  This coincided with the Defendant's possession of piles of mail, identifications and bank cards that did not belong to him, namely from addresses in Clinton, Maryland.

3







4



When the Defendant was arrested on October 5, 2021, related to his state drug and gun charges, he was initially held at the Anne Arundel County Detention Center.  While there, the Defendant contacted one of his co-Defendants, asking him to wipe the Defendant's iPhone that had been seized by the police.

As detailed in the plea agreement, the Defendant played a significant role in a total loss of over $1.5M from the COVID-19 CARES Act funds created at a time of a national health crisis not seen in 100 years.

<u>BAH-22-087</u>:

Anne Arundel County Police had no idea when they executed a search warrant at the Defendant's home on October 5, 2021, that they would be walking into ghost-gun operation, complete with kits, a drill press, guns in varying degrees of assembly, as well as ammunition, magazines, and drug grows – this on top of the apparent fraud and theft evidence littering the home as well.

Upon entry into the living room area of the home, just inside the front door, a gold-colored AR style rifle equipped with a suppressor was laying on the couch:



Count 1



Count 3 - suppressor

Also on the couch, AAPD located a red and black AR lower receiver, loose 9 mm rounds, and miscellaneous stolen check and documents. A gold magazine and a clear magazine were also found. The couch was also strewn with a bag of gun parts, a laptop, a holster, and other loose gun parts like magazines and ammunition. The couch had a storage area, and inside that law enforcement found a gun box, a 9mm Glock magazine, a Pro Mag Drum magazine, a loaded .40 caliber magazine, .40 caliber ammunition, body armor, loose 9 mm rounds, a lower P80 AR15, and a card reader.

 

Examples of firearm parts being assembled by Defendant

A plastic storage container on the floor held more loose ammunition, various documents in the name of other people, an AR lower, a loaded Glock .40 caliber magazine, American Eagle .40 caliber ammunition, and PMC .223 ammunition box. On the center table in front of the couch was an iPhone, a golden upper for a firearm, and more loose ammunition.

In the nearby black ottoman, officers seized a bag of US Currency, an AR lower receiver, a black rifle grip, and firearm tools. A black 980 firearm was also located along with a loaded drum magazine and baggies of marijuana. The Defendant had a 3D printer which he used to create firearm parts like a silencer/suppressor. Located on a table, AAPD located a Glock 17 slide kit, a Glock 43 slide kit, two homemade suppressor/silencers, loose ammunition, and 8 cell phones.



homemade suppressor made with 3D printer

The Defendant had a large blue drill press which was found on the floor, used for assembling and altering firearms, specifically to alter ghost guns into fully automatic weapons:



The Defendant had constructed black tents with fans, wires, and lighting inside his residence for marijuana grows, and he converted a bedroom closet into a marijuana grow as well:



Law enforcement found even more contraband in the Defendant's bedroom including loose ammunition, marijuana grows, miscellaneous suspected stolen documents from the mail, a black P80 frame, a 3D printed blue frame, a silver handgun upper, and a Maxim Black AR Pistol with a loaded drum magazine and a suppressor:



Count 1



Count 3 - suppressor

Also on the Defendant's bed was a Romarm Mini Draco firearm with a loaded magazine and a Glock 43X, 9MM handgun:



Count 2



Count 2

Law enforcement seized over $5500 in cash, 5 grams of fentanyl, over a gram of Eutylone, and well over 350 g of marijuana. The overall seizure from the Defendant's home is overwhelming and completes the picture of a person who was manufacturing and altering firearms as well as perpetrating several different fraud schemes as a way to support himself.



Most of the firearms, gun parts, ghost guns, and cash seized on October 5, 2021

### (2)    The History and Characteristics of the Defendant:

Also under 18 U.S.C. § 3553(a)(1), the history and characteristics of the Defendant must be considered.  The Government has factored the Defendant's criminal history and his background in determining that a recommendation of 75 months of incarceration is sufficient, but no greater than necessary.

The Defendant's prior convictions include Possession of CDS (2011/PBJ), Possession of Marijuana (2012); and Second-Degree Assault (2019/PBJ).  The Defendant was still on probation in the Second-Degree Assault conviction at the time he was committing the offenses in this case. The Government recognizes these convictions, which give rise to the Criminal History Category of II, do not reflect a history of violence.  As such, the Government has made this under-guidelines recommendation in balancing this criminal history with the other factors of sentencing.  However, there are other characteristics of the Defendant that should be considered here.

The Defendant's cell phone was also seized during the October 2021 search warrant.  That cell phone contained text messages demonstrating not only the Defendant's vast knowledge of firearms and altering and manufacturing ghost guns, but his willingness to sell and distribute his creations.

On May 9, 2021, the Defendant (in green) and a co-Defendant, Dementrous Smith (in blue), discuss whether the Defendant has a Glock 26 handgun available:

9







On May 20, 2021, their conversation continues wherein Smith says he is going to pick up Yancy's fully automatic firearm aka "full," that day:





The Defendant also engaged in conversations with a person named "Tay," discussing the assembly of ghost guns.  A snippet of their conversation from December 13, 2020, is below:

11





The Defendant's background, growing up with two parents and siblings, can be described as "normal" and "supportive," per the Defendant (ECF 229, ¶ 69)  He graduated from high school and completed some college courses.  The Defendant does have a work history.  This does not appear to be a situation where the Defendant comes from a background of abject poverty, drug addiction, and hopelessness.   At the time of his arrest in October 2021, he was living in a residence that cost just over $1900 per month to rent.  It is clear that these crimes were intentional choices the Defendant made despite having strong family support in his life and the ability to maintain fairly steady employment.

### (3)     Need to Afford Adequate Deterrence to Criminal Conduct:

Under 18 U.S.C. § 3553(a)(2)(B), there is a need "to afford adequate deterrence to criminal conduct." A sanction needs to be imposed to send a signal to others who would contemplate engaging in wire fraud and aggravated identity theft.  A sentence of 75 months of incarceration for this fraud scheme and firearms violation deters others.

General deterrence is particularly important sentencing factor in fraud cases such as this one because it is viewed to be effective. *See United States v. Martin¸* 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Edwards¸* 595 F.3d 1004, 1021 (9th Cir. 2010)("[B]ank fraud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate

decision.")  The deliberate nature of fraud often renders it more difficult to uncover, since individuals engaged in fraud take affirmative steps to conceal their identities and conduct.

The pandemic led to a surge in identity theft and fraud against government programs in 2020 and thereafter, resulting in estimated hundreds of billions of total losses[1].  Despite its best efforts, law enforcement will be unable to catch and convict all of the opportunistic fraudsters who made off with taxpayers' funds during the pandemic.  This case presents a worthwhile opportunity for the Court to impose a sentence that will grab the attention of those who may be considering similar crimes.

As to the firearms charges, ghost guns and the private manufacturing of firearms continues to be a major problem in our state and in the United States[2].  The Defendant circumvented the firearms laws of this country by engaging in the purchase and assembly of ghost guns:  guns sold in parts that can be assembled in the home by an unlicensed buyer.  The gun kits, when shipped to places like the Defendant's home, are 80% complete, and the Defendant would then assemble the final 20 percent himself.  These assembled guns do not have serial numbers or other critical information that allows law enforcement to trace these guns to manufacturers and gun dealers. The Defendant, who was disqualified from owning firearms due to his Second-Degree Assault conviction, nevertheless was able to possess firearms, having kits shipped to his home or brought to him for assembly.  A background check to purchase these kits is not required.  The Defendant had the additional skills of being able to put pin holes in the firearms he was assembling, making these firearms fully automatic – meaning the firearm can now discharge an entire magazine of rounds with only one pull of the trigger.  The two AR rifles seized in this case had been altered to do just that – becoming machine guns because the Defendant made it so.

The possession of these firearms, of the gun kits, ammunition, and firearms tools, were deliberate decisions.  Not only does the Defendant need to be specifically deterred from these crimes in future, but there also needs to be a message of general deterrence that unlawful possession of automatic weapons like the machine guns in this case will not be tolerated and will be punished – a respect for the law, for those governing the legal possession of lawful firearms and those that protect from illegally manufactured unlawful firearms, is necessary.  The Court can accomplish this with a significant sentence of 75 months.

## (4)    Need to Avoid Unwarranted Sentence Disparities:

Under 18 U.S.C. § 3553(a)(6), there is a need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Although Wire Fraud cases are not novel in this jurisdiction, the backdrop of the COVID-19 crisis in the United States from 2020 through at least 2022 is unique.  This case is even more specific because firearms, specifically machine gun possession, is a factor.

---

[1] *See* Richard Lardner et al, The Great Grift: How billions in COVID-19 relief aid was stolen or wasted, Associated Press, June 12, 2023, http://apnews.com/article/pandemic-fraud-waste-billions-small-business-labor-fb1d9a9eb24857efeb4611344311ae78.

[2] *See* Annie Karnie, et al, Ghost Guns: What They Are and Why There's a Fight Over Them, New York Times, August 8, 2023, https://www.nytimes.com/article/what-are-ghost-guns.html.

The most similar case is *United States v. Jerry Phillips*, TDC-22-073. Here, the defendant and his co-defendant, Jaleel Phillips, were sentenced to 7 years and 30 months in prison, respectively. The men applied for UI claims as well as other loans, using the PII of victims. They were able to fraudulently obtain more than $1M in COVID-19 CARES Act Paycheck Protection Program (PPP) loan applications, Economic Injury Disaster loan (EIDL) applications and UI claims. Additionally, Jerry Phillips had a machine gun in his possession at the time of his arrest, which he had purchased as a "ghost gun" and modified. Both Jerry and Jaleel Phillips had a criminal history category of I. Like the Defendant, Jerry Phillips also had body armor, ghost guns, and loads of ammunition at the time of his arrest.

Other COVID fraud cases include several that the Government has brought to the Court's attention during the sentencings of the Defendant's co-conspirators thus far. In *United States v. Gladstone Njokem*, RDB-21-338, the defendant and his co-defendants conspired to impersonate victims in order to obtain money by submitting fraudulent claims for UI benefits. Their scheme amounted to a $1.3M loss and affected over 183 victims with regard to stolen PII. Judge Bennett imposed a sentence of 54M of incarceration in addition to the restitution and three years of supervised release. The defendant's criminal history category was a II.

In the *United States v. Keon Ball*, DKC-20-248, the defendant was sentenced to 66 months in prison in relation to a $715,000 wire fraud scheme that encompassed at least 10 victims of aggravated identity theft. The defendant applied for multiple COVID-19 CARES Act PPP loans using the names of the victims and perpetrated other types of frauds as well.

In a look across the country as to how various districts are sentencing COVID-19 related fraud cases committed during a time of national crisis, several cases are consistent with the Government's recommendation here and have yield significant sentences. *See, e.g., United States v. Joseph Marsell Cartlidge, Eric Alexander McMiller, and David Christopher Redfern¸* 1:20-CR-340 (M.D.N.C. 2022) (receiving 72 months, 66 months, and 60 months of imprisonment, respectively for submitting fraudulent PPP and EIDL applications, obtaining $1.2M in loans); *United States v. Lola Kasali*, 4:20-MJ-1106 (S.D. Tex. 2022) (receiving 70 months of imprisonment for submitting two fraudulent PPP loan applications and obtaining $1.9M in loans); *United States v. Tarik Freitekh*, 3:20-CR-00435 (W.D.N.C. 2022) (receiving 87 months of imprisonment for submitting fraudulent PPP applications and obtaining $1.75M in loans) *United States v. Adam D. Arena*, 21-MJ-05134 (W.D.N.Y. 2022) (receiving 66 months of imprisonment for his role in fraudulently obtaining and laundering approximately $950,000 in pandemic loans).

A sentence of 75 months is wholly consistent with the sentences imposed in this District and in the United States for this type of fraud committed during a global pandemic, with the additional Possession of Machine Gun conviction.

14

## II.    Victim Impact

The Government has notified the victims of the offense of the sentencing hearing; it is still unknown if some will submit victim impact statements, address the Court at sentencing, and/or attend the sentencing hearing.  No victim impact statements have been received to date.  Of course, as victims of the offense, they are entitled to do any/all of the above.  See, 18 U.S.C. § 3771.  As soon as the Government is aware, we will advise the Court.

## III.    Restitution Request

Pursuant to 18 U.S.C. § 3663A and U.S.S.G. §5E1.1, restitution shall be ordered in this case.  As such, the United States respectfully requests that an Order of Restitution be entered, as part of the Defendant's sentence in this matter, in the total amount of $2,094,319.00, joint and several with the co-defendants.  The Government will provide contact information for the payment of restitution to these victims to the Courtroom Deputy via a separate document.

## IV.    Forfeiture

In case BAH-22-219, the forfeiture amount is calculated to be $452,990.00.  The Government will file a forfeiture order in advance of sentencing reflecting the total amount.

In case BAH-22-087, the defendant has agreed to forfeit the firearms that were seized during the search warrant at his home on October 5, 2021.  The Government will file a forfeiture order in advance of sentencing detailing those firearms.

## V.    Conclusion

For the reasons set forth above, the government respectfully submits that 75 months of incarceration and 3 years of supervised release is a reasonable sentence, and is sufficient, but not greater than necessary to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a)(2).

Very truly yours,

Erek L. Barron
United States Attorney

Colleen Elizabeth McGuinn
Assistant United States Attorney

15